FILED
2009 Jun-29  AM 11:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

"incorporated by reference" "AmSouth's Annual Report on Form 10-K for the year ended December 31, 2005, and Quarterly Report on Form 10-Q as of June 30, 2006." As detailed previously herein, AmSouth's 2005 Form 10-K and Quarterly Reports on Form 10-Q as of June 30, 2006 were false and misleading in that they concealed that AmSouth's loan/lease loss provisions were materially understated due to AmSouth's lack of experience lending and servicing the growing portfolio of adjustable interest rate loans and failure to take appropriate loan loss reserves based on the reasonable expected losses in its loan portfolio.

119.   Concerning the "Opinion of Regions' Financial Advisor," the Proxy Statement falsely stated that:  (i) Merrill Lynch had "made its determination as to fairness *on the basis of its experience and professional judgment after considering the results of all of its analyses*"; (ii) that "[w]ith respect to the financial forecast information and the expected synergies furnished to or discussed with Merrill Lynch by AmSouth or Regions, Merrill Lynch assumed that they had been reasonably prepared *and reflected the best currently available estimates and judgment of the management of AmSouth or Regions as to the expected future financial performance of AmSouth or Regions*, as the case may be, *and the expected synergies*"; (iii) concerning its completion of a discounted dividend analysis as to the value of AmSouth pre-Acquisition and the combined entity *pro forma*, the Proxy Statement stated that Merrill Lynch used discount rates ranging

from 11.0% to 13.0%, ***rates Merrill Lynch viewed as the appropriate range for companies with AmSouth's risk characteristics***; and (iv) that "[i]n conducting its analyses and arriving at its opinions, Merrill Lynch utilized a variety of ***generally accepted valuation methods***" in "provid[ing] its opinion to the Regions board of directors as to the fairness, from a financial point view, to Regions of the exchange ratio pursuant to the merger agreement."

120.   The statements concerning Merrill Lynch's fairness opinion were false and misleading as:  (i) the rushed due diligence provided would had not permitted Merrill Lynch to apply its "***experience,***" to exercise its "***professional judgment,***" or to "***consider . . .*** the results of ***all*** of its analyses" before rendering its fairness opinion – instead, the "fairness" had been a foregone conclusion and Merrill Lynch was merely selling its stamp of approval; (ii) Merrill Lynch knew the "financial forecast information and the expected synergies furnished to or discussed with" it did not "reflect . . . the ***best currently available estimates and judgment of the management of AmSouth or Regions as to the expected future financial performance of AmSouth or Regions***" or the "***expected synergies***"; (iii) discount rates ranging from 11.0% to 13.0% were not "***the appropriate range for companies with AmSouth's risk characteristics***"; and (iv) Merrill Lynch had not "utilized...***generally accepted valuation methods***" in "provid[ing] its opinion to the

Regions board of directors as to the fairness, from a financial point view, to Regions of the exchange ratio pursuant to the merger agreement."

121.   Concerning the "Accounting Treatment" of the Acquisition, the Proxy Statement stated that the "assets (including identifiable intangible assets) and liabilities . . . of AmSouth as of the effective time of the merger w[ould] be **_recorded at their respective fair values_** and added to those of Regions" that "[a]ny excess of purchase price over the net fair values of AmSouth assets and liabilities [would be] recorded as goodwill (excess purchase price)," and that "[f]inancial statements of Regions issued after the merger [would] reflect such fair values . . . ." These statements were false and misleading as AmSouth's loan loss provisions were materially understated, resulting in an overstatement of the value of its assets as of the time of the Acquisition.   Moreover, due to the drive to "double" AmSouth's exposure to the Florida real estate market since 2004 and its failure to record proper loan loss reserves, the goodwill being attributed to the AmSouth acquisition would immediately be impaired upon completion of the Acquisition.

**Defendants' False and Misleading Post-Acquisition Statements**

122.   On November 4, 2006 the Individual Defendants issued a release entitled "Regions and AmSouth Complete Merger," which stated in relevant part that:

> "This creates a top 10 U.S. bank holding company with leading positions in some of the fastest growing markets in the United States and an even

- 70 -

broader range of products, services and locations for our 5 million customer households," said Jackson W. Moore, chairman of Regions' Board of Directors.

"With the combination of these two great companies we have redoubled our commitment to providing great service to our customers and forming strong relationships with our communities," said Dowd Ritter, president and chief executive officer of Regions and the former chairman, president and chief executive officer of AmSouth.

123.   On January 19, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports Fourth Quarter 2006 Earnings," which reported 4Q 06 earnings of 56 cents per diluted share, promised "[m]erger integration progressing as planned and on schedule," reported a net interest margin of 4.10% in the 4Q 06, reported "[r]ecord full-year earnings of $151 million at Morgan Keegan," and *"[s]trong credit quality."* The release also stated in relevant part:

### Newly merged company achieves targeted earnings, merger goals

"Regions reported solid fourth quarter earnings that matched our expectations and we're pleased with the underlying performance of our newly combined company." said Dowd Ritter, president and chief executive officer. "And importantly, our merger integration is on track and meeting or, in some cases, exceeding our goals. *This gives us confidence as we enter 2007 to successfully complete the transition to a new, more efficient, and increasingly profitable company.*"

\* \* \* \*

4Q and full year 2006 EPS rise 7 and 17 percent versus year-ago periods, respectively, excluding merger-related charges

Regions' fourth quarter 2006 net income was $361.6 million, or 56 cents per diluted share, which included $59.3 million in after-tax merger-related expenses (9 cents per diluted share).  Excluding the impact of merger-related expenses in both years, per share earnings were 65 cents, or 7 percent above year-ago fourth quarter's 61 cents.  The fourth quarter was also impacted by an after-tax mortgage servicing rights (MSR) impairment charge of approximately $16.8 million (3 cents per diluted share).

For the full year 2006, Regions earned a record $1.4 billion, or $2.67 per diluted share, including $60.3 million of after-tax merger-related charges (12 cents per diluted share).  In 2005, Regions reported net income totaling $1.0 billion, or $2.15 per diluted share, including $110 million (23 cents per diluted share) in after-tax merger-related charges. Excluding merger-related charges, annual per share earnings increased 17 percent to $2.79 from $2.38.

\* \* \* \*

***Loan portfolio growth was solid during the quarter, led by commercial lending.***

\* \* \* \*

***Morgan Keegan delivered another record year with full-year 2006 profits of $151.1 million on revenues of $1.0 billion.  Fourth quarter revenues and earnings rose to $307.5 million and $46.9 million, respectively.  Included in these results were approximately $30 million in revenues and $7 million in net income resulting from the addition of AmSouth's brokerage, trust and asset management units.   In the seasonally strong fourth quarter, both fixed income and equity capital markets activity, particularly in investment banking, were very strong as was the retail brokerage business.***

Partially offsetting these increases, the mortgage business continues to experience a challenging environment.  Mortgage originations increased to $4.9 billion in the fourth quarter, helped by the addition of AmSouth's mortgage business.  However, lower levels of loan sales and early payment default losses negatively impacted gain on sale fees and profitability at our non-conforming mortgage company, EquiFirst.

Today, January 19, 2007, Regions announced the signing of a definitive agreement to sell EquiFirst Corporation to Barclays Bank PLC. The transaction is expected to close in the first half of 2007.

\* \* \* \*

**Credit quality remains strong**

**Credit quality trends remain positive with net loan charge-offs of $56.1 million, or an annualized 0.27 percent of average net loans in the quarter.** Net loan charge-offs in the quarter include $11.0 million related to conforming certain credit policies.

**Fourth quarter's provision for loan losses totaled $60.0 million. The total reserve for credit losses was 1.17 percent of net loans at Dec. 31, 2006.** Total non-performing assets at Dec. 31, 2006, were $379.1 million, or 0.40 percent of loans and other real estate, compared to a $312.0 million, or 0.52 percent at Sept. 30; **the dollar increase was driven largely by assets acquired in the AmSouth merger.**

[Emphasis added.]

124. On March 1, 2007, the Individual Defendants and E&Y caused Regions to file its false and misleading Fiscal 2006 annual report with the SEC, which included substantially the same financial results previously reported on January 19, 2007. **The Form 10-K further reflected Regions' goodwill balance for the fiscal year ending December 31, 2006 as $11.2 billion, reporting that its goodwill was not impaired.** Concerning Regions' "Critical Accounting Policies," the 2006 10-K expressly stated that:

Regions' excess purchase price **is tested for impairment annually, or more often if events or circumstances indicate impairment may exist.** Adverse changes in the economic environment, declining operations of acquired business units, or other factors could result in a decline in

- 73 -

implied fair value of excess purchase price. *If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value.*

[Emphasis added.]

125.   As to Regions' "Allowance for Credit Losses," the 2006 10-K stated

that:

> *The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year-end.* The allowance for credit losses consists of two components, the allowance for loan losses and the reserve for unfunded credit commitments.   Management's assessment of the adequacy of the allowance for credit losses is based on the combination of both of these components . . . .
>
> *At December 31, 2006, the allowance for credit losses totaled $1.1 billion or 1.17 percent of total loans, net of unearned income compared to $783.5 million or 1.34 percent at year-end 2005.  The increase in the allowance is primarily related to the acquisition of AmSouth, which added $335.8 million to the overall allowance.  The decrease in the allowance for credit losses to total loans ratio was primarily due to the acquisition of AmSouth, which had a ratio lower than that of Regions. AmSouth's lower allowance for credit loss ratio reflected a product mix higher in residential mortgage secured credits, which inherently have lower loss content . . . .*   Management expects the allowance for credit loss ratio to vary over time due to changes in economic conditions, loan mix, changes in collateral values or variations in other factors that may affect inherent losses.
>
> *Factors considered by management in determining the adequacy of the allowance for credit losses include but are not limited to:  (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments, and (7) management's analysis of economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. ***This comprehensive process also assists in the prompt identification of problem credits.***

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each pool and management's judgment of current economic conditions and their expected impact on credit performance.

***Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans which management has identified as impaired, and which are greater than $2.5 million ($1.0 million in 2005), are evaluated individually for purposes of determining appropriate allowances for credit losses . . . . If current valuations are lower than the current book balance of the credit, the negative differences are reviewed for possible charge-off . . . .***

\* \* \* \*

***Management considers the current level of allowance for credit losses adequate to absorb probable losses inherent in the loan portfolio and unfunded commitments . . . .***

[Emphasis added.]

126. On April 13, 2007, the Individual Defendants caused Regions to announce that CFO Bryan Jordan had resigned and that its controller Alton E. "Al"

Yother had been named CFO.  Yother was AmSouth's CFO at the time of the Acquisition.

127.   On April 17, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports First Quarter 2007 Earnings," reporting 1Q 07 earnings from continuing operations of 65 cents per diluted share, stating integration was "on track with successful conversions of mortgage and brokerage systems," reporting a net interest margin of 3.99 percent, Morgan Keegan earnings of $45.5 million, and *"[l]ow credit losses of an annualized 0.20 percent of average loans."* The release also stated in relevant part that:

> *"Our first quarter earnings demonstrate strong core results,"* said Dowd Ritter, president and chief executive officer.  "This quarter was also marked by progress in our merger integration, including successful systems conversions and completion of required branch divestitures.  In addition, we completed the sale of EquiFirst, our non-conforming mortgage origination business.  *This strong start to 2007 is tangible evidence that the many anticipated benefits of the merger are beginning to be realized."*

> \* \* \* \*

> On March 30, 2007, Regions completed the sale of its non-conforming wholesale mortgage originator, EquiFirst Holdings Corp., to Barclays Bank PLC.  Thus, EquiFirst's first quarter results were reported as discontinued operations, and prior periods were reclassified accordingly.  *EquiFirst sustained a first quarter after tax net loss of $141.1 million (19 cents per diluted share).  The closing of the EquiFirst transaction essentially ends Regions' direct exposure to a business that had become increasingly difficult and was outside the company's strategic focus.*

> \* \* \* \*

- 76 -

*Morgan Keegan's momentum continued during the quarter, earning $45.5 million on revenue of $302.0 million. Results were driven by the private client retail brokerage division and trust division which both increased revenue during the quarter due to strong sales levels. Offsetting this success somewhat was a seasonal slowdown in equity capital markets activities.*

\* \* \* \*

*Credit losses remain low*

*Net loan charge-offs declined to $46.0 million, or an annualized 0.20 percent of average net loans in first quarter 2007 compared to $56.1 million or an annualized 0.27 percent of average loans in fourth quarter 2006. Net loan charge-offs in the previous quarter included $11.0 million related to conforming certain credit policies between Regions and AmSouth.*

*The first quarter's provision for loan losses totaled $47.0 million. The total reserve for credit losses was 1.18 percent of net loans at March 31, 2007, up one basis point from the previous quarter. Total non-performing assets at March 31, 2007, were $422.5 million, or 0.45 percent of loans and other real estate, compared to $379.1 million, or 0.40 percent at Dec. 31, 2006. The increase in non-performing assets is primarily attributable to real estate loans for which Regions believes it is adequately reserved.*

[Emphasis added.]

128.   On May 7, 2007, the Individual Defendants and E&Y caused Regions to filed its unaudited interim financial report for the 1Q 07, which included substantially the same financial results previously reported on April 17, 2007. *The Form 10-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2007 as $11+ billion, reporting that its goodwill was not impaired.* As to Regions' "Allowance for Credit Losses," the 1Q 07 10Q stated that:

- 77 -

***The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the portfolio as of March 31, 2007.***  The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities.  The assessment of the adequacy of the allowance is based on the combination of both of these components.  Regions determines its allowance in accordance with regulatory guidance, Statement of Financial Accounting Standards No. 114, "Accounting by Creditors for Impairment of a Loan" ("Statement 114") and Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("Statement 5").

At March 31, 2007 and December 31, 2006, the allowance totaled $1.1 billion.  The allowance was 1.18% at March 31, 2007 compared to 1.17% at year-end 2006.  Net loan losses as a percentage of average loans (annualized) were 0.20% in the first quarter of 2007 compared to 0.27% in the fourth quarter of 2006 . . . .

***Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to:  (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their expected impact on credit performance.***

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. ***This comprehensive process also assists in the prompt identification of problem credits.***

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools

- 78 -

sharing common risk characteristics.  Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above.  Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.   All loans which management has identified as impaired, and which are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances. ***If current valuations are lower than the current book balance of the credit, the negative differences are reviewed for possible charge-off.  In instances where management determines that a charge-off is appropriate, it is taken immediately.***

[Emphasis added.]

129.   On May 11, 2007, the Individual Defendants caused Regions to file a false and misleading registration statement with the SEC which expressly incorporated by reference the Company's Fiscal 2006 annual financial report, including (with E&Y's consent) E&Y's clean audit opinion, and the interim financial report for the Company's 1Q 07. Once declared effective, the registration statement would permit Regions to conduct "shelf offerings" of its securities via a prospectus which would incorporate by reference all financial reports filed with the SEC between the time the registration statement was declared effective and the date of the securities offering.

130.   On July 16, 2007, the Individual Defendants caused Regions to announce it had completed Phase I of the integration of AmSouth, with 633

Alabama and Florida branches successfully converted and re-branded as "Regions."

The release stated in relevant part that:

> "We executed a smooth conversion as planned, which is a testament to the diligent preparations our team made during the last several months. Our associates did what they do best – put the customers' needs first, and it has paid off remarkably well," said Dowd Ritter, president and chief executive officer of Regions Financial Corporation. "We took the best combination of systems, policies and practices from both companies and blended them together, which will enable us to deliver more convenience and better products, along with a single-minded focus on making banking simple and easy."

131.    On July 17, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports Second Quarter 2007 Earnings," which reported 2Q 07 earnings from continuing operations of 63 cents per diluted share, the ""[s]uccessful conversion of more than 600 branches," stated "Morgan Keegan achieve[d] record earnings of $50.1 million," emphasized that *"[c]redit costs remain low with net charge-offs of an annualized 0.23 percent of average loans."*

The release also stated in relevant part that:

> *Second quarter EPS steady with prior quarter,* excluding merger-related charges and discontinued operations.
>
> Regions' second quarter 2007 income from continuing operations was $453.7 million, or 63 cents per diluted share, which included $37.2 million in after-tax merger-related expenses (6 cents per diluted share). Excluding the impact of merger-related expenses, earnings per diluted share from continuing operations were 69 cents, equal to the first quarter of 2007, despite the lack of income from the first quarter divestiture of 52 branches. Those branches had contributed approximately $20 million to pre-tax earnings, or 2 cents per diluted share, in the first quarter.

* * * *

***Regions Mortgage's revenues improved by $3.8 million compared with the prior quarter despite the continuing operating challenges the entire mortgage industry faces.***

Also, in an effort to manage interest rate sensitivity, approximately $1 billion of investment securities were sold at a loss of $32.8 million. A majority of the proceeds have been re-invested in higher yielding securities without extending duration.

* * * *

***Credit quality remains strong, non-performing loans begin to normalize***

Net loan charge-offs increased to $53.9 million, or an annualized 0.23 percent of average net loans in the second quarter of 2007 compared to $46.0 million or an annualized 0.20 percent of average loans in the prior quarter.

The second quarter's loan loss provision totaled $60.0 million. The total reserve for credit losses was 1.19 percent of net loans at June 30, 2007, up one basis point from the previous quarter. Total non-performing assets at June 30, 2007, were $585.0 million, or 0.62 percent of loans and other real estate, compared to $422.5 million, or 0.45 percent at March 31, 2007. ***The increase in non-performing assets was driven partly by weaker demand for certain types of commercial real estate projects and also by the implementation of one set of more prescriptive credit policies, including extensive credit file reviews, for the combined company.***

[Emphasis added.]

132. On August 3, 2007, the Individual Defendants and E&Y caused Regions to file its interim financial report for the 2Q 07 with the SEC, which included substantially the same financial results previously reported on July 17,

2007.  **The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2007 as $11+ billion, reporting that its goodwill was not impaired.**  As to Regions' "Allowance for Credit Losses," the 2Q 07 10Q stated that:

> **The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the portfolio as of June 30, 2007.**  The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities.  The assessment of the adequacy of the allowance is based on the combination of both of these components . . . .

> **At June 30, 2007 and December 31, 2006, the allowance totaled approximately $1.1 billion.**  The allowance as a percentage of net loans was 1.19% at June 30, 2007 compared to 1.17% at year-end 2006.  Net loan losses as a percentage of average loans (annualized) were 0.21% in the first six months of both 2007 and 2006 . . . .

> **Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to:  (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their impact on credit performance.**

> Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio.  **This comprehensive process also assists in the prompt identification of problem credits.**

- 82 -

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $439.4 million at June 30, 2007, compared to $237.5 million at December 31, 2006 . . . .* Within total impaired loans, $83.4 million of these loans had specific reserves of approximately $17.1 million at June 30, 2007. This compares to $70.1 million of impaired loans having specific reserves of approximately $17.6 million at December 31, 2006. *While impaired loans increased, they are well-secured by real estate collateral.*

[Emphasis added.]

133.   On October 16, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports Third Quarter 2007 Earnings," which reported 3Q 07 earnings from continuing operations of 56 cents per diluted share, stated "[m]erger integration goals [were] being achieved ahead of schedule," that "Morgan Keegan continues strong performance," and reported: *"Credit quality steady."* The release stated in relevant part that:

"Business conditions continued to be less than optimal during the quarter, *but our conservative operating culture continues to serve us well in this challenging environment,*" said Dowd Ritter, president and chief executive officer. *"Regions' underwriting standards and avoidance of higher-risk credit concentrations coupled with a strong capital position have been a buffer against recent turmoil in the credit and liquidity markets."*

- 83 -

*Merger successes evident in third quarter earnings results*

*Regions' merger integration efforts remain on track . . . .*

* * * *

Based on the success of the first conversion event, the remaining conversion schedule has been condensed into two events and accelerated to be completed this December, allowing 2008 to begin with complete focus on operating goals.   Testing for the upcoming October 29 conversion of branches in Tennessee, Mississippi and Louisiana is now complete.  Related associate training is nearing completion as well.

* * * *

Non-interest revenue, excluding securities transactions, was $705.2 million in the third quarter, driven by Morgan Keegan, Regions' broker-dealer operation, and high levels of customer derivative activity. *Morgan Keegan achieved another strong quarter, with earnings of $45.2 million on revenue totaling $318.4 million Morgan Keegan's equity banking revenue was higher in the quarter on merger and acquisition activity*; however, this strength was offset somewhat by lower fixed income banking transactions linked-quarter.  *Morgan Keegan continued to book a significant number of new customer accounts, reflecting success in leveraging Regions' broadened customer base.*

* * * *

*Net charge-offs of 27 basis points of average loans, non-performing assets at 62 basis points of loans and other real estate*

Net loan charge-offs increased to $63.1 million, or an annualized 0.27 percent of average net loans in the third quarter of 2007 compared to $53.9 million, or an annualized 0.23 percent of average net loans in the prior quarter.  The linked-quarter increase was primarily due to higher levels of consumer-related losses. *Regions continues to expect full-year 2007 net charge-offs in the mid-20s basis point range.*

- 84 -

> *Third quarter's loan loss provision totaled $90.0 million. The total reserve for credit losses was 1.19 percent of net loans at September 30, 2007, consistent with the prior quarter.*
>
> *Total non-performing assets at September 30, 2007, were $588.3 million, or 0.62 percent of loans and other real estate, compared to $585.0 million, or 0.62 percent at June 30, 2007.* Regions sold or transferred to held for sale $76.6 million of non-performing loans during the quarter. The balance of loans migrating to non-performing status was primarily residential real estate related.

[Emphasis added.]

134. On November 9, 2007, the Individual Defendants and E&Y caused Regions to filed its interim financial report for the 3Q 07 with the SEC, which included substantially the same financial results previously reported on October 16, 2007. *The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2007 as $11+ billion, reporting that its goodwill was not impaired.* As to Regions' "Allowance for Credit Losses," the 3Q 07 10Q stated that:

> *The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the loan portfolio and off-balance sheet credit commitments as of September 30, 2007.* The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities. The assessment of the adequacy of the allowance is based on the combination of both of these components . . . .
>
> *At September 30, 2007 and December 31, 2006, the allowance totaled approximately $1.1 billion. The allowance as a percentage of net loans was 1.19% at September 30, 2007 compared to 1.17% at year-end 2006. Net loan losses as a percentage of average loans (annualized) were*

- 85 -

*0.23% and 0.19% in the first nine months of 2007 and 2006, respectively . . . .*

*Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to:    (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their impact on credit performance.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics.  Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above.  Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.  Impaired loans totaled approximately $431.1 million at September 30, 2007, compared to $237.5 million at December 31, 2006.*  The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report . . . .  Within total impaired loans, $114.5 million of these loans had specific reserves of approximately $22.6 million at September 30, 2007.  This compares to $70.1 million of impaired loans having specific reserves of approximately $17.6 million at December 31, 2006.  *While impaired*

> ***loans increased, they are generally well-secured by real estate
> collateral.***

[Emphasis added.]

135.   On October 31, 2007, the Individual Defendants caused Regions to
issue a release entitled "Regions Successfully Completes Seamless Conversion in
Louisiana, Mississippi and Tennessee - 612 Outlets Converted, Rebranded in
Regions' Phase II of Merger Integration," stating this "reflect[ed] nearly two-thirds
of the company's branch network in its 16-state footprint."  The release also stated
in relevant part that:

> Immediately following the merger announcement on November 4, 2006,
> key decisions regarding systems platforms, products, and branch
> distribution were made to ensure a smooth transition for customers.
> Many changes were made well in advance to ensure the conversion had
> minimal impact on customers, including reissuing all debit cards,
> renumbering duplicate accounts and migrating the AmSouth telebanking
> center to the Regions voice response unit.

136.   On November 6, 2007, almost one year to the day after the AmSouth
Acquisition, the Individual Defendants announced Moore would be retiring
effective December 31, 2007, with Ritter replacing him as Chairman of the Board.
The Company's release of that day stated that "[u]pon retirement from the
company, Moore will be paid the remaining benefits under his employment
agreement."

137.   On November 15, 2007, the Individual Defendants announced that
Allen Morgan, Chairman of Morgan Keegan and a director and the Vice Chairman

- 87 -

of the Regions Board was retiring from all three positions, effective December 31, 2007.

138.   On December 10, 2007, the Individual Defendants announced that Regions had completed its AmSouth integration ahead of schedule and exceeded its integration goals.  The release issued that day also stated in relevant part that:

> Regions Financial Corporation . . . has completed its merger integration and is now operating under one name and with one set of systems across the company's 16-state footprint.  With the completion of the final systems integration today in Georgia, North Carolina, South Carolina, Virginia, Texas, Arkansas, Missouri, Iowa, Illinois, Indiana and Kentucky, *the company also noted that it has met or exceeded all of the goals it had set for the merger integration.*
>
> *"The completion of the merger marks a significant achievement for our company and positions us for long-term growth,"* said Dowd Ritter, president and chief executive officer of Regions Financial Corporation. *"We executed a near-flawless conversion while meeting or exceeding the integration goals we established.* In fact, we completed the merger ahead of our original schedule and are exceeding our cost save targets.  I am extremely proud of what we accomplished this past year and especially the contribution of all of our Regions associates who put in tremendous effort to make the merger integration a success."

[Emphasis added.]

139.   On January 3, 2008, after the close of trading, the Individual Defendants suddenly announced *Regions was quadrupling its 4Q 07 loan loss provision and a $38 million charge for projected losses on the Morgan Keegan funds*.  The release issued that day stated in relevant part that:

> Regions Financial Corporation today announced it plans to increase its loan loss provision to approximately $360 million in the fourth quarter of

2007, an increase of approximately $270 million from the third quarter of 2007.  Regions' decision was prompted by weakening credit quality, primarily in its residential builder loan portfolio.  Fourth quarter 2007 net loan charge-offs and non-performing assets are expected to rise to approximately an annualized 46 basis points of average loans and 91 basis points of period-end loans and foreclosed properties, respectively. The total allowance for credit losses is expected to be strengthened to about 1.45 percent of net loans at December 31, 2007, from the prior period's 1.19 percent.

"We are experiencing a sharp slowdown in real estate demand, *especially in parts of Florida* and Georgia, *and are responding aggressively to counter its effects*," said Dowd Ritter, chairman and chief executive officer.  *"We are closely monitoring the impact of the declines in housing demand and values on our borrowers and are acting quickly to address current areas of weakness."*

Residential builder loans represent approximately 8 percent, or $7.5 billion, of Regions' total portfolio of $95 billion.  In addition to increasing the loan loss provision, the company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers.  While Regions expects that these actions will help mitigate the overall effects of the credit down cycle, it also expects that weakness in the homebuilder segment will continue well into 2008.  Accordingly, it is anticipated that Regions' non-performing asset and charge-off levels will continue to increase as the year progresses.

*Despite more challenging residential real estate market conditions, loans within Regions' residential first mortgage and home equity portfolios generally continue to perform well.*

*Regions believes its strong capital position and core earnings power will position the company for continued long-term success despite the current credit cycle.*

*Other charges*

Regions also expects to record approximately $131 million of additional pre-tax charges in the fourth quarter of 2007, excluding merger-related

expenses. ***These charges include: $38 million in projected losses from investments in Morgan Keegan funds***; $51 million for liabilities relating to the Visa USA Inc. antitrust lawsuit settlement with American Express and other pending Visa litigation (reflecting Regions' share as a Visa member); and $42 million in other valuation-related expenses, the majority of which relate to its mortgage servicing business. Regions expects that proceeds from an anticipated share redemption related to its ownership interest in Visa's planned initial public offering will more than offset its recorded Visa-related liabilities.

[Emphasis added.]

140.   While conceding that several of Regions' residential developments had "zero activity today" during a conference call later on the evening of January 3rd, the Individual Defendants attempted to mollify investors by stating that loans to home builders only made up approximately 8%, or $7.5 billion, of Regions' loan portfolio of $95 billion, with Regions' Chief Risk Officer William Wells stating that the rest of Regions' loan portfolio was performing "relatively well." And as the real estate and credit markets continued to soften in the first half of 2008, the Individual Defendants would continue to cause Regions to repeatedly reassure the investment community that the Company had taken the appropriate steps to decrease its exposure to troubled mortgages.

141.   This was part of a series of partial disclosures and revelations concerning the truth about Regions' exposure to the U.S. residential mortgage market. Nonetheless, Regions' stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the relevant

period, was accompanied by the Individual Defendants' denials and continued misrepresentations. Regions' stock closed down $2.33 per share to close at $20.95 per share on January 4, 2008, a one-day decline of 10%, its biggest decline in a decade. FIG Partners' Chris Marinac stated in his report that "[i]nvestors should be pleased that Regions has come back to reality – we didn't believe their rosy outlook in October and neither did the Street judging by the stock the past 10 weeks." Regions' stock had lost 45% in the prior twelve month period compared to the KBW Bank Index of 24 large U.S. banks.

142. On January 22, 2008, the Individual Defendants caused Regions to issue a release announcing its FY 2007 and 4Q 07 financial results, including:

- Earnings from continuing operations of 10 cents per diluted share;

- $134 million in pre-tax non-merger-related charges;

- Increased provision for loan losses to $358 million – $251 million above charge-offs and $268 million higher than third quarter 2007;

- Increased allowance for credit losses to 1.45% of year-end loans from prior period's 1.19%;

- Implemented aggressive plan to address effects of weakening housing demand on residential builder loan portfolio;

- Successfully completed merger integration; cost saves continue to exceed expectations; and

- Reiterated "Morgan Keegan continues strong performance, including record quarterly revenue."

143.   The release also stated in relevant part that:

***Fourth quarter EPS of 24 cents, excluding merger-related charges***

\* \* \* \*

***"Despite an increasingly challenging operating environment, Regions is well positioned for 2008 and beyond," said Dowd Ritter, chairman, president and chief executive officer.  "With our successful merger integration behind us, our full energy is focused on managing through current market challenges and the execution of our three-year strategic plan."***

***Merger integration successfully completed.***

\* \* \* \*

***Annualized net charge-offs of 45 basis points of average loans, non-performing assets at 90 basis points of loans and other real estate***

Net loan charge-offs increased to $107.5 million, or an annualized 0.45 percent of average net loans, in the fourth quarter of 2007 compared to $63.1 million, or an annualized 0.27 percent of average net loans in the prior quarter.   The linked-quarter increase was partially related to deterioration in the residential homebuilder loan portfolio, a result of the housing down cycle in some of the Company's markets, including Florida and Atlanta. ***Loans within Regions' residential first mortgage and home equity portfolios continue to perform relatively well.***

As previously reported, residential homebuilder loans represent approximately 8 percent, or $7.2 billion, of Regions' total portfolio of $95.4 billion. ***In addition to increasing the loan loss provision, the Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers.***   Approximately $850 million of

- 92 -

loans have been identified to be managed by Regions' special assets department.

Indicative of the more challenging credit environment, the fourth quarter's loan loss provision totaled $358.0 million, or $250.5 million above actual fourth quarter net loan charge-offs. The total reserve for credit losses was 1.45 percent of net loans at December 31, 2007, a significant increase over the prior quarter's 1.19 percent.

Total non-performing assets at December 31, 2007, were $864.1 million, or 0.90 percent of loans and other real estate, compared to $588.3 million, or 0.62 percent at September 30, 2007. Stress on the residential builder portfolio largely drove the quarterly increase. Non-performing assets and net charge-off levels are expected to continue upward in 2008 as the depressed housing market further evolves.

* * * *

Morgan Keegan continued to expand customer relationships, opening 21,300 new retail accounts in the quarter, with overall revenue increasing $32.5 million to a quarterly record of $350.9 million. Strong revenue momentum was offset by a $38.5 million loss on investments in two Morgan Keegan mutual funds, resulting in a net earnings drop to $25.1 million compared to the prior quarter's $45.2 million. These investments, which had a market value of approximately $65 million at year-end 2007, were made to provide liquidity for the funds.

* * * *

The linked-quarter increase in fourth quarter non-interest expenses, excluding merger costs, was primarily due to $120.4 million of the charges originally announced January 3rd. As outlined at that time, *these charges include: $38.5 million in losses from investments in Morgan Keegan funds;* $51.5 million for liabilities relating to the Visa USA Inc. antitrust lawsuit settlement with American Express and other pending Visa litigation (reflecting Regions' share as a Visa member); and $30.4 million in other valuation-related expenses, the majority of which relate to Regions' mortgage servicing business. Regions expects that proceeds from an anticipated share redemption related to its ownership interest in Visa's planned initial public offering will more

- 93 -

than offset its recorded Visa-related liabilities.  The balance of the pre-tax non-merger charges announced on January 3rd was recorded as an offset to non-interest income.

**_Capital position remains strong_**

**_At December 31, 2007, Regions' capital position, as measured by the tangible stockholders' equity-to-tangible assets ratio, was a strong 5.88 percent. This compared to 6.02 percent at September 30, 2007._**

[Emphasis added.]

144.  On February 27, 2008, the Individual Defendants and E&Y caused Regions to file its false and misleading annual financial report for FY 2007 with the SEC, which included substantially the same financial results previously reported on January 22, 2007. **_The Form 10-K further reflected Regions' goodwill balance for the fiscal year ending December 31, 2007 as $11.5 billion, reporting that its goodwill was not impaired._**  In fact the 10-K stated that "[e]xcess purchase price at December 31, 2006 totaled $11.2 billion as compared to $5.0 billion at December 31, 2005" and that the "significant increase in this balance is related to the AmSouth merger." Regions' "Critical Accounting Policies," the 2006 10-K expressly stated that:

**_Regions' excess purchase price is tested for impairment annually, or more often if events or circumstances indicate impairment may exist._** Adverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in implied fair value of excess purchase price. **_If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value._**

[Emphasis added.]

      145.   Concerning Regions' "Allowance for Credit Losses," the release stated that:

> ***The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year end.*** The allowance for credit losses consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance for credit losses is based on the combination of both of these components . . . .

> ***At December 31, 2007, the allowance for credit losses totaled $1.4 billion or 1.45 percent of total loans, net of unearned income compared to $1.1 billion or 1.17 percent at year end 2006.*** The increase in the allowance for credit loss ratio reflects management's estimate of the level of inherent losses in the portfolio, which management believes increased significantly during the fourth quarter of 2007 due to a slowing economy and a weakening housing market. The increase in non-performing assets was a key determining factor in the assessment of inherent losses and, as a result, was an important factor in determining the allowance level. ***Non-performing assets increased from $379.1 million at December 31, 2006 to $864.1 million at December 31, 2007, with $275.7 million of the increase occurring during the fourth quarter of 2007 . . . .***

> ***Factors considered by management in determining the adequacy of the allowance for credit losses include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's analysis of economic conditions.***

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management, and Special Assets, are involved in the credit risk management process to assess the accuracy of risk ratings,

the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. ***This comprehensive process also assists in the prompt identification of problem credits.***

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance for credit losses based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each pool and management's judgment of current economic conditions and their expected impact on credit performance.

***Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses . . . .***

***Management considers the current level of allowance for credit losses adequate to absorb losses inherent in the loan portfolio and unfunded commitments.***

[Emphasis added.]

146.   On February 13, 2008, the Individual Defendants announced CFO Yother was stepping down and would be replaced by Esteves effective April 1, 2008.

147.   On February 27, 2008, the Individual Defendants announced that Doug Edwards, Morgan Keegan's President and CEO, was also stepping down in April 2008.

148.   On April 15, 2008, the Individual Defendants caused Regions to issue a release announcing its 1Q 08 financial results, reporting earnings from continuing operations of 48 cents per diluted share, reporting that "[n]et credit losses totaled an annualized 0.53 percent of average loans," that "[n]on-performing assets were 1.25 percent of period-end loans and other real estate," that it had increased its allowance for credit losses $52.8 million, to 1.49% of March 31, 2008 loans from year-end 2007's 1.45%.  The release also stated in relevant part that:

> ***"Given the turmoil throughout the financial industry, Regions is successfully managing through the challenges, and remains well-positioned for the balance of 2008 and beyond,"*** said Dowd Ritter, chairman, president and chief executive officer.  ***"During the first quarter, we continued to take steps to proactively deal with credit risks and enhance Regions' already strong balance sheet.  We also continued to gain greater operating leverage, while implementation of our three-year strategic plan is establishing a solid foundation for future growth and performance improvement."***
>
> * * * *
>
> Net loan charge-offs increased to $125.8 million, or an annualized 0.53 percent of average net loans, in the first quarter of 2008 compared to $107.5 million, or an annualized 0.45 percent of average net loans, in the prior quarter.  The linked-quarter increase was primarily driven by the previously discussed residential homebuilder portfolio and the Company's home equity portfolio, both of which are closely tied to the housing market slowdown.  Although the home equity portfolio weakened due to declining residential property values, losses remain manageable at an annualized 0.57 percent of related average outstandings and compare favorably relative to Regions' peer group.
>
> ***The company is aggressively managing its residential homebuilder portfolio.***  Overall exposure to this portfolio now stands at $6.2 billion.

- 97 -

*Indicative of the more challenging credit environment, the first quarter's loan loss provision totaled $181.0 million, or $55 million above first quarter net loan charge-offs. The total allowance for credit losses was 1.49 percent of net loans at March 31, 2008, an increase over the prior quarter's 1.45 percent.*

*Total non-performing assets at March 31, 2008, were $1,204.4 million, or 1.25 percent of loans and other real estate, compared to $864.1 million, or 0.90 percent at December 31, 2007.* Non-performing assets and net charge-off levels are expected to continue upward in 2008 as the strained economic climate continues.

* * * *

Morgan Keegan continued to contribute significant client relationships and revenues, opening 21,400 new retail accounts in the quarter, resulting in total revenue of $338.9 million.   This solid revenue performance was partially offset by a $24.5 million pre-tax loss on investments in two Morgan Keegan mutual funds, resulting in net earnings of $31.0 million, excluding merger charges, compared to the prior quarter's $25.1 million. The mutual fund investments had a market value of approximately $38 million at March 31, 2008.

* * * *

In addition to the previously mentioned charges related to Morgan Keegan, first quarter non-interest expenses include a $42.0 million MSR impairment charge and a $65.4 million loss on early debt extinguishment.

*Capital position remains strong*

At March 31, 2008, Regions' capital position, as measured by the tangible stockholders' equity-to-tangible assets ratio, was 5.90 percent. This compared to 5.88 percent at December 31, 2007.

[Emphasis added.]

149.   On or about April 28, 2008 defendants caused Regions to file its

prospectus for the April 2008 Offering with the SEC falsely stating Regions had

$141 billion in assets and $19.8 billion in shareholders' equity.  The Prospectus also expressly incorporated by reference Regions' Fiscal 2007 annual report, including (with E&Y's consent) E&Y's clean audit opinion, and certain other disclosures filed with the SEC subsequent to the filing of the registration statement in May 2007.  On or about April 28, 2008, the Individual Defendants and Merrill Lynch caused Regions to issue and sell 13.8 million shares of the securities to the public at $25 each, receiving gross proceeds of $345 million.  The Prospectus contained material misstatements concerning the value of the Company's real estate loan portfolio and its goodwill, as alleged herein, exposing Regions to hundreds of millions of dollars in potential **strict** liability to investors for violations of the 1933 Securities Act.

150.   On May 7, 2008, the Individual Defendants and E&Y caused Regions to file its false and misleading interim financial report for the 1Q 08 with the SEC, which included substantially the same financial results previously reported on April 15, 2008. ***The Form 10-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2008 as $11.5 billion, reporting that its goodwill was not impaired.***  As to Regions' "Allowance for Credit Losses," the 1Q 08 10Q stated that:

> ***The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of March 31, 2008.***  The allowance consists of two components:  the allowance for loan losses and the reserve for unfunded credit commitments.   Management's assessment of the adequacy of the allowance is based on the combination of both of these components . . . .

- 99 -

*At March 31, 2008 and December 31, 2007, the allowance totaled approximately $1.4 billion. The allowance as a percentage of net loans was 1.49% at March 31, 2008 compared to 1.45% at year-end 2007. Net loan losses as a percentage of average loans (annualized) were 0.53% and 0.20% in the first three months of 2008 and 2007, respectively.* The increase in the allowance was primarily driven by deterioration in the residential homebuilder portfolio and losses within the home equity portfolio, both of which are tied directly to the housing market slowdown . . . .

*Factors considered by management in determining the adequacy of the allowance include, but are not limited to:  (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's analysis of economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $899.5 million at March 31, 2008, compared to $660.4 million at December 31, 2007 . . . .* All loans that management has identified as impaired, and that are greater than $2.5 million, are

evaluated individually for purposes of determining appropriate allowances for credit losses.  For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices . . . . ***While impaired loans increased, they are generally well-secured by real estate collateral.***

[Emphasis added.]

151.   On July 22, 2008, the Individual Defendants caused Regions to issue a release announcing Regions' 2Q 08 financial results and disclosing that ***Regions' quarterly cash dividend would be cut by approximately 75% from $0.38 to $0.10 per share "to further strengthen its capital position."*** For the 2Q 08, the release disclosed earnings from continuing operations of 30 cents per diluted share, disclosed "[h]igher net loan charge-offs, at an annualized 0.86 percent of average loans, primarily due to home equity and residential homebuilder credit deterioration," announced "[a]llowance for credit losses increases to 1.56 percent of loans," and reported a "[f]urther rise in non-performing assets to 1.65 percent of period end loans and other real estate," but provided for an "[i]ncrease in average loan growth to 6 percent annualized, driven by prudent support of Regions' best commercial customers through the current cycle."  The release also stated in relevant part that:

Net loan charge-offs increased to $209.0 million, or an annualized 0.86 percent of average net loans, in the second quarter of 2008 compared to $125.8 million, or an annualized 0.53 percent of average net loans, in the prior quarter. ***The linked-quarter increase was primarily driven by continuing deterioration of the Company's home equity portfolio,***

- 101 -

*particularly lines in a second lien position in Florida, and its residential homebuilder portfolio, both of which are closely tied to declining residential property values.*

Home equity credits accounted for over half of the increase in net-charge-offs, rising to an annualized 1.94 percent of outstanding loans and lines. *The increase was mostly due to Florida-based credits, where property valuations in certain markets have experienced significant and rapid deterioration.* While these loans and lines represent approximately $5.4 billion or one-third of Regions' total home equity portfolio, they accounted for just under two-thirds of total company home equity losses in the second quarter. *As further evidence of the acute stress in Florida's housing market, second quarter home equity losses amounted to an annualized 3.55 percent of loans and lines in that state versus 1.08 percent across the remainder of Regions' footprint.* A number of actions have been taken to mitigate future losses in the home equity portfolio. These include a strong Customer Assistance program that educates customers about workout options and initiates early contact with customers to discuss workout solutions *when a loan first becomes delinquent*.

Second quarter losses within the residential homebuilder portfolio were also higher, in line with expectations. This portfolio now stands at $5.8 billion, a $473 million reduction versus first quarter.

Reflecting continuing challenges in the credit environment, the second quarter's loan loss provision totaled $309.0 million, or $100.1 million above net loan charge-offs. The total allowance for credit losses was 1.56 percent of net loans at June 30, 2008, an increase over the prior quarter's 1.49 percent.

Total non-performing assets at June 30, 2008, were $1.6 billion, or 1.65 percent of loans and other real estate, compared to $1.2 billion, or 1.25 percent at March 31, 2008. *Residential homebuilder and condominium loans were the primary drivers of the linked-quarter increase.* Proactive management of these portfolios continued during the second quarter, as Regions disposed of approximately $147 million of properties, the majority of which had been classified as non-performing assets; additional dispositions are expected to be executed on an opportunistic basis.

- 102 -

* * * *

Overall, Morgan Keegan had another good quarter, contributing $38.2 million in net income. Fixed-Income Capital Markets' strong revenues were offset by somewhat weaker Equity Capital Markets results, causing total revenues to remain relatively unchanged linked quarter. Expenses dropped $11.6 million, primarily due to reduced personnel costs and write-downs. ***Write-downs on its investments in two mutual funds totaled $13.4 million compared to a $24.5 million charge in the first quarter.*** The mutual fund investments' market value approximated $22.3 million at June 30, 2008.

[Emphasis added.]

152. On August 7, 2008, the Individual Defendants and E&Y caused Regions to file its false and misleading interim report for the 2Q 08 with the SEC, which included substantially the same financial results previously reported on July 22, 2008. ***The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2008 as $11.5 billion, reporting that its goodwill was not impaired.*** As to Regions' "Allowance for Credit Losses," the 2Q 08 10Q stated that:

> ***The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of June 30, 2008.*** The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance is based on the combination of both of these components . . . .
>
> ***At June 30, 2008 and December 31, 2007, the allowance totaled approximately $1.5 billion and $1.4 billion, respectively.*** The allowance as a percentage of net loans was 1.56% at June 30, 2008 compared to 1.45% at year-end 2007. Net charge-offs as a percentage of average loans (annualized) were 0.70% and 0.21% in the first six months

- 103 -

of 2008 and 2007, respectively. *The increase in the allowance was primarily driven by deterioration in the residential homebuilder and condominium portfolios and losses within the home equity portfolio, all of which are tied directly to the housing market slowdown . . . .*

*Home equity credits accounted for over half of the increase in net charge-offs, rising to an annualized 1.94% of outstanding loans and lines during the second quarter of 2008. The increase was mostly due to Florida-based credits, where property valuations in certain markets have experienced significant and rapid deterioration.* These loans and lines represent approximately $5.4 billion of Regions' total home equity portfolio. Of that balance, approximately $1.9 billion represent first liens; second liens, which total $3.5 billion, are the main source of losses. Florida second lien losses were 4.74% during the second quarter of 2008. *Second quarter home equity losses amounted to an annualized 3.55% of loans and lines in Florida versus 1.08% across the remainder of Regions' footprint.*

The remainder of the increase in net charge-offs during the second quarter of 2008 relates primarily to the residential homebuilder portfolio, which is discussed earlier in this report. Specifically, charge-offs in the residential homebuilder portfolio totaled $34.2 million in the second quarter of 2008.

*Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the Company's policies relating to delinquent loans and charge-offs; (4) the level of the allowance in relation to total loans and to historical loss levels; (5) levels and trends in non-performing and past due loans; (6) collateral values of properties securing loans; (7) the composition of the loan portfolio, including unfunded credit commitments; and (8) management's analysis of current economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the*

*prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate future losses, particularly in the more problematic portfolios. Specific to the residential homebuilder portfolio, $1.8 billion of relationships have been identified as problem loans and are being aggressively managed to mitigate risk. Significant action in the management of the home equity portfolio has also been taken. A portfolio evaluation was completed during the quarter, which will provide detailed property level information to assist in workout strategies. Also, a strong Customer Assistance Program is in place which educates customers about options and initiates early contact with customers to discuss solutions when a loan first becomes delinquent.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $1,246.3 million at June 30, 2008, compared to $660.4 million at December 31, 2007 . . . . While impaired loans increased, they are generally secured by real estate collateral.*

[Emphasis added.]

153.  On September 30, 2008, *The Birmingham News* issued an article entitled "Regions Stock Plummets 41 Percent; CEO Dowd Ritter Says Business Is Strong," which stated in part:

Birmingham-based Regions Financial Corp.'s stock plummeted 41 percent on Monday, but CEO Dowd Ritter expressed confidence in the strength of his company's Main Street business amid turmoil on Wall Street.

- 105 -

\* \* \*

But ***Ritter noted that while other banks are writing off billions every quarter, Regions has so far made about a half-billion in profit this year.***

***"There's a pretty simple reason," he said. "We always have taken a very conservative approach to our business. At times, we may not be doing what is in vogue, but that plain vanilla banking plays very well in times like this."***

***Ritter said Regions is well-capitalized by regulatory standards, as evidenced by its recent takeover of the failed Georgia-based Integrity Bank last month, at the request of the Federal Deposit Insurance Corp.***

***"We are a safe harbor, if you will, for deposits," he said.***

***He also noted that Regions is not burdened with exotic securities and risky mortgages that have prompted the demise of other institutions. Regions has few subprime mortgages in its entire portfolio, he said.***

***"All that said, it doesn't matter whether we're lucky or smart, we've avoided the real troubled areas that are plaguing many in this industry," he said.***

[Emphasis added.]

154. On October 21, 2008, the Individual Defendants caused Regions to issue a release announcing its 3Q 08 financial results, disclosing reporting of 11 cents per diluted share for the quarter ended September 30, 2008, disclosing it was "[a]ggressively managing well-defined credit issues, with $430 million in non-performing assets either sold or transferred to held for sale," with "[n]et charge-offs and other real estate expense related to these dispositions total[ing] approximately $186 million," stating "[n]on-performing assets, excluding assets held for sale, ***steadied*** at 1.66 percent of period end loans and other real estate," disclosing "[n]et

loan charge-offs an annualized 1.68 percent of average loans, driven by accelerated

problem asset disposition," such that "[e]xcluding impact of sales and transfers to

held for sale, net loan charge-offs an annualized 1.03 percent of average loans," but

highlighting its "Tier 1 capital ratio at an estimated 7.47%, $1.7 billion above well-

capitalized level."   The release also stated in relevant part that:

> Regions' 2008 third quarter net income was $79.5 million or 11 cents per
> diluted share, which included $26.1 million (after-tax) in merger-related
> expenses and loss on discontinued operations.  Excluding the impact of
> merger-related expenses, earnings per diluted share from continuing
> operations were 15 cents compared to the previous quarter's 39 cents. ***A
> decision to accelerate disposition of problem assets drove a large
> portion of increased credit costs.***  Net charge-offs and other real estate
> expense related to these dispositions totaled approximately $186 million
> . . . .

> "This past quarter will likely be regarded as one of the most turbulent
> and challenging periods in the history of the financial services industry,"
> said Dowd Ritter, chairman, president and chief executive officer.
> "Credit quality and capital adequacy issues, along with a slowing
> economy, have created an unprecedented operating environment for
> financial companies. ***Regions is taking aggressive actions to counter its
> effects and is well-positioned to weather the storm.***"

> Emphasis on problem loan and property dispositions helps control non-
> performing asset levels; drives increased net loan charge-offs . . . .

> In the third quarter, Regions either sold or transferred to held for sale
> approximately $430 million of non-performing loans and foreclosed
> properties. Losses on those transactions totaled $186 million and largely
> accounted for the linked-quarter increase in net loan charge-offs and
> other real estate expense.

> Total third quarter net loan charge-offs rose to $416 million, or an
> annualized 1.68 percent of average loans, from second quarter's $209
> million, or 0.86 percent. The majority of the increase was attributable to

- 107 -

non-performing loan dispositions, which effectively reduces future balance sheet risk. Excluding these loan dispositions, net charge-offs were an annualized 1.03 percent of average loans. In line with expectations, commercial real estate construction losses, primarily related to homebuilders and condominiums, were the driver of the losses.

Home equity net loan charge-offs improved to an annualized 1.59 percent of average loans and lines from second quarter's 1.94 percent. An aggressive approach to contacting and helping customers, and actions such as fortifying the collections function and creating a separate team entirely focused on Florida home equity loans, are positively impacting losses.

Regions recorded a third quarter loan loss provision which essentially matched net charge-offs, and also added $9.4 million to its reserve for unfunded commitments. As a result, the allowance for credit losses increased slightly to 1.57 percent of September 30 loan balances.

### *Proactive management of well-defined credit issues*

Residential homebuilder exposure continued to decline as a result of a focus on property dispositions as well as loan repayments. As of September 30, 2008, homebuilder balances totaled $5.2 billion, a $556 million decrease compared to second quarter. Regions also made progress working down its condominium exposure, which now totals $1.1 billion, down $532 million or by one-third since year-end. Lastly, as described above, *the company's efforts to manage its home equity portfolio, especially its exposure to second liens in Florida, have made headway as evidenced by reduced losses.*

Non-performing assets, including loans classified as held for sale, increased $141 million versus the previous quarter to 1.79 percent of loans and foreclosed assets. Excluding $129 million of loans classified as held for sale, nonperforming assets were little changed at 1.66 percent of loans and other real estate, despite continued migration of residential homebuilder credits and condominium projects to non-performing status.

### *Stable capital position*

> ***At September 30, Regions' Tier 1 ratio was an estimated 7.47 percent,
> $1.7 billion above the "well capitalized" threshold as defined by
> regulatory standards.***

[Emphasis added.]

155.   The October 22, 2008 release also disclosed that Regions had been

invited to participate in the U.S. Government's TARP bailout program and that

defendants intended to cause Regions to accept TARP funds:

> Regions has been notified that it is eligible and ***does intend to participate
> in the capital purchase program announced by the Treasury
> Department on October 13, 2008.***  The capital is in the form of senior
> perpetual preferred stock (together with warrants to purchase common
> stock) and qualifies as Tier 1 capital for regulatory purposes.  It is being
> offered at an attractive coupon of 5 percent for the first five years.
> Qualified institutions can obtain between 1 percent and 3 percent of their
> total risk-weighted assets as of September 30, 2008, as defined by
> banking regulations.  For Regions, this would approximate between
> $1.17 billion and $3.51 billion of capital, providing a significant
> strengthening of our overall capital base.

[Emphasis added.]

156.   On October 23, 2008, *The Wall Street Journal* issued an article entitled

"***Regions Financial Must Think We're All Stoned***," which stated in relevant part:

> As of Sept. 30, Regions had a $1.5 billion loan-loss allowance,
> equivalent to just 83 percent of its nonperforming assets, which were
> $1.8 billion.  A year earlier, Regions' allowance was at 175 percent of
> nonperforming assets.  A year before that, it was at 249 percent.

> Keeping Up

> ***Common sense tells you a bank's loan-loss allowance, in an economic
> decline, should be rising as a percentage of nonperforming assets.  It's
> the reserve a lender sets up on its balance sheet in anticipation of bad
> loans.  At Regions, the allowance hasn't kept up.***

- 109 -

[Emphasis added.]

157.   Nonetheless, on October 30, 2008, the Individual Defendants and E&Y caused Regions to file its false and misleading interim financial report for the 3Q 08, which included substantially the same financial results previously reported on October 21, 2008. *The Form 10-Q still reflected Regions' goodwill balance for the quarter ending September 30, 2008 as $11.5 billion, reporting that its goodwill was not impaired.* As to Regions' "Allowance for Credit Losses," the 3Q 08 10Q stated that:

> *The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of September 30, 2008.*  The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments . . . .

> *At September 30, 2008 and December 31, 2007, the allowance totaled approximately $1.5 billion and $1.4 billion, respectively.*   The allowance as a percentage of net loans was 1.57% at September 30, 2008 compared to 1.56% at June 30, 2008 and 1.45% at year-end 2007.  Net charge-offs as a percentage of average loans (annualized) were 1.03% and 0.23% in the first nine months of 2008 and 2007, respectively. *The increase in the allowance was primarily driven by deterioration in the residential homebuilder, condominium and home equity portfolios, all of which are tied directly to the housing market slowdown . . . .*

> For the third quarter of 2008, net charge-offs on home equity credits were an annualized 1.59% of home equity loans compared to an annualized 0.31% for the third quarter of 2007.  However, net charge-offs on home equity credits decreased on a linked-quarter basis from an annualized 1.94% of outstanding loans and lines during the second quarter of 2008. *Losses in Florida-based credits remained at elevated levels, as property valuations in certain markets have continued to experience ongoing deterioration.*  These loans and lines represent

- 110 -

approximately $5.6 billion of Regions' total home equity portfolio at September 30, 2008. Of that balance, approximately $2.0 billion represent first liens; second liens, which total $3.6 billion, are the main source of losses. *Florida second lien losses were 4.28% annualized during the third quarter of 2008 as compared to 4.74% during the second quarter of 2008. Third quarter home equity losses in Florida amounted to an annualized 3.28% of loans and lines versus 0.69% across the remainder of Regions' footprint.* This compares to second quarter 2008 losses of 3.55% and 1.08%, respectively.

The remainder of the increase in net charge-offs during the third quarter of 2008 relates primarily to the residential homebuilder portfolio, which is discussed earlier in this report, and the disposition of non-accrual loans. During the third quarter of 2008, a total of $327 million in non-accrual loans were sold or designated as held for sale with associated charge-offs of approximately $163 million.

*Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the Company's policies relating to delinquent loans and charge-offs; (4) the level of the allowance in relation to total loans and to historical loss levels; (5) levels and trends in non-performing and past due loans; (6) collateral values of properties securing loans; (7) the composition of the loan portfolio, including unfunded credit commitments; and (8) management's analysis of current economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate losses, particularly in the more problematic portfolios.* Specific to the residential homebuilder portfolio, $2.2 billion of relationships are being aggressively managed to mitigate risk. *Significant action in the management of the home equity portfolio has also been taken.* A portfolio evaluation was completed during the quarter, which provided

- 111 -

detailed property level information to assist in workout strategies. *Also, a strong Customer Assistance Program is in place which educates customers about options and initiates early contact with customers to discuss solutions when a loan first becomes delinquent.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $1,268.7 million at September 30, 2008, compared to $660.4 million at December 31, 2007.* The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for loan losses. For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices. Specifically reviewed impaired loans totaled $768.8 million, and the allowance allocated to these loans totaled $132.6 million at September 30, 2008. This compared to $337.2 million of specifically reviewed impaired loans with allowance allocated to these loans of $58.7 million at December 31, 2007.

[Emphasis added.]

158.   On October 24, 2008, the Individual Defendants caused Regions to announce that it had determined to accept $3.5 billion in TARP funds, with the Company's release stating in relevant part that the cash infusion would "*increase*

***Regions' Tier 1 capital to approximately 10.5 percent"*** and ***"enable [it] to expand***

***lending and step up acquisitions."***

      159.   On November 7, 2008, *The Birmingham Business Journal* issued an

article entitled "Loan Charge-Offs Mount at Birmingham Banks," which stated in

relevant part that:

> Net charge-offs – the gross amount of loans charged off as bad debt,
> minus money recovered on collateral of earlier charge-offs – are on the
> rise as the financial crisis deepens at local banks.

> ***If a bank has a high level of charge-offs, it likely means they delved***
> ***into hazardous lending practices, banking experts say.***

> ***"You are what you eat – and charge-offs are an indication of risky***
> ***loans that have been made," said Bankrate.com senior financial***
> ***analyst Greg McBride.***

Specifically referencing Regions, the story warned:

> Richard Bove, banking analyst with New York-based Landenburg
> Thalmann & Co. Inc., said in a research note that ***despite the company's***
> ***"high level of charge-offs," its "nonperforming assets keep rising."***

> According to Bove's calculations, all types of Region's non-performing
> loans, including foreclosures and loans more than 90 days past due,
> climbed to $2.4 billion in the quarter, a more than 9 percent increase.

> ***Bove said Regions was itching to get into the Florida market for years,***
> ***and it was one of the reasons behind its $10 billion acquisition of***
> ***AmSouth Bancorp.  Now that the Sunshine State has been hammered***
> ***by the housing slump, "it appears the company has reversed course***
> ***and is moving out of Florida assets as quickly as it can," he said.***

> ***Region's hike in charge-offs indicate "the bank should probably have***
> ***been writing off loans at a faster rate," he said.  "The fact that it did***
> ***not do so indicates that the future write-offs and reserve builds will be***
> ***sizable.  This will meaningfully penalize earnings."***

[Emphasis added.]

160. On December 22, 2008, the Individual Defendants caused Regions to issue a release disclosing that Regions had reached an agreement with the IRS over its 1999-2006 tax issues, including those involving Union Planter and AmSouth, and that "during the fourth quarter the company has decided to sell non-performing assets, targeting an increase in the range of $500 million to $600 million and increasing its loan loss provision above net charge-offs to reflect the accelerating economic weakness."

161. Suddenly, on January 20, 2009, before the market opened, the Individual Defendants shocked the market by announcing that Regions reported *a net loss of $5.6 billion for the 4Q 08*, stating the loss "was largely driven by a *$6 billion non-cash charge for impairment of goodwill*." Regions' January 20th release also disclosed:

> -- *Accelerated disposition of problem assets*, with approximately $1 billion in non-performing assets sold or transferred to held for sale, *resulting in approximately $479 million of losses*
>
> -- *Net loan charge-offs rose to an annualized 3.19 percent of average loans*
>
> -- *Increased loan loss provision to $1.150 billion*, $354 million above net charge-offs; raised allowance for credit losses to 1.95 percent of loans

162.   On this news, Regions' stock plunged from $6.07 per share on January 16, 2009 to $4.60 per share on January 20, 2009, a one-day decline of 25% on three times the average daily trading volume over the prior 30 days.

163.   If the Individual Defendants' release was to be believed, the "results of goodwill impairment testing at the end of the fourth quarter *[SUDDENLY]* indicated that the estimated fair value of Regions' banking reporting unit was less than its book value, ***requiring a $6 billion non-cash charge***." But $6 billion impairments do not happen overnight, rendering the statements the Individual Defendants and E&Y had collectively caused Regions to make during the relevant period, that they were regularly checking the value of the goodwill attributable to the AmSouth acquisition and that it was not impaired, materially false and misleading. Instead, Regions' earnings had been overstated as a result of Regions' overvaluing of AmSouth's loan portfolio and an inadequate level of loan-loss reserves, largely related to its Florida operations, and a lack of adequate internal accounting controls.

164.   On January 20, 2009, *Bloomberg.com* issued an article entitled "Regions Plunges to 23-Year Low on $6.24 Billion Loss," which stated in relevant part:

> Regions fell $1.47 to $4.60 at 4 p.m., the lowest price since March 13, 1985. ***The bank has lost more than three-quarters of its market value in the past 12 months.***
>
> ***The lender almost tripled its reserves to cover bad debt to $1.15 billion in the fourth quarter from $358 million in the same period a year***

- 115 -

> **earlier.  It had $1.7 billion in loans no longer collecting interest in the
> quarter.**

[Emphasis added.]

165.    On January 20, 2009, *TheStreet.com* issued an article entitled "Regions

Dividend at Risk After Posting Loss," which stated in part:

\* \* \*

> The noncash goodwill impairment charge represented premiums paid for
> acquisitions over the years, which most large banks are continually
> assessing in the current troubled environment.

> Excluding the charge, Regions Financial's net loss would have been 35
> cents a share, but even that exceeded the Thomson Reuters consensus
> estimate of an 8 cent-per-share loss for the fourth quarter.

\* \* \*

> At first glance, it may appear that Regions Financial's asset quality
> improved during the fourth quarter, since the nonperforming assets ratios
> dropped to 1.26% from 1.45% the previous quarter.  **But the main
> reason for the drop in nonperformers was a large increase in net loan
> charge-offs, with home builder and condominium loans comprising the
> bulk of the fourth-quarter loan losses.**

\* \* \*

> **This means that if the pace of charge-offs continues at this level for the
> next few quarters, the company needs to continue its elevated levels of
> loan loss provisions, leading to more net losses.**

[Emphasis added.]

166.    On January 23, 2009, the *Birmingham Business Journal* issued an

article entitled "Regions Financial's $6 billion write-down may start trend," which

stated in part:

- 116 -

> *In an in-depth report on Regions released earlier this month, Audit Integrity said the company's accounting practices are considered "aggressive" and the company is at high risk of restating its quarterly earnings reports to account for losses it might not be disclosing in the present.*

> The firm's rating system *found at least 10 red flags against Regions based on third quarter 2008 data and surmised that the company might be overvaluing its assets because of its large goodwill*, assuming lower than usual liability risks on its pension compensation and for its high noninterest income compared to noninterest expenses.

> * * *

> *"Whether this (recent) write-down indicated that Regions has fully disclosed its risky or overstated assets is another question,"* Zwingli said.

> *"Until we see the quality and transparency of their disclosures improve, we would continue to anticipate further write-downs and unrealized losses in the quarters ahead."*

[Emphasis added.]

167.   On February 2, 2009, the *Birmingham Business Journal* issued an article entitled "Regions shares drop after Moody's downgrade," which stated in part:

> Regions Financial Corp.'s share prices tumbled 15 percent in late afternoon trading Monday after Moody's Investor Service downgraded its ratings.

> Regions Bank, the Birmingham-based titan's primary subsidiary, *was knocked down to a C+ from a B- and its long-term deposits dwindled to A2 from A1.*

> * * *

- 117 -

*The credit rating agency said the company had a "negative outlook," because of its deteriorating loan portfolios in the troubled Florida market.*

*"Net charge-offs for the fourth quarter of 2008 were nearly double that of the prior quarter and reflect a pace of asset quality deterioration beyond Moody's prior expectations,"* Moody said in a research note.

[Emphasis added.]

168.   The Individual Defendants' improper loan review process, reporting of inflated loan portfolio values and failure to maintain adequate loan-loss reserves had a material adverse effect on Regions' operating results.  By failing to report the true facts concerning Regions' loan portfolio, the financial statements the Individual Defendants and E&Y caused Regions to issue and file with the SEC during the relevant period failed to provide investors with basic information necessary to understand Regions' financial results and omitted material information, needlessly exposing Regions to hundreds of millions of dollars in potential civil fines, penalties and judgments from regulators and investors.

169.   The true facts, which were known by the defendants but concealed from the investing public during the relevant period, and/or were omitted from the April 2008 Prospectus and the Merger Proxy, were as follows:

(a)     AmSouth's decision to "double" its presence in the over-stimulated Florida real estate lending market between 2004 and 2006, coupled with AmSouth's lack of experience lending and servicing adjustable rate mortgages and the fact that it

was keeping these loans on its own books rather than repackaging them and selling them to other investors, significantly increased the risk associated with the AmSouth assets and diminished AmSouth's (and then Regions') ability to accurately calculate adequate loan loss reserves;

(b)     AmSouth had failed to adequately reserve for mortgage-related exposure, causing its balance sheet and financial results to be artificially inflated;

(c)     The five days the Individual Defendants permitted Regions' executives and financial advisors to conduct due diligence on the AmSouth acquisition was woefully deficient, rendering the fairness opinion by Merrill Lynch false and misleading;

(d)     The $11+ billion in "goodwill" the Individual Defendants and E&Y had caused Regions to continue carrying on its books from the inception of the AmSouth Acquisition on November 4, 2008 was grossly impaired (including the over $6 billion worth attributable to the AmSouth Acquisition);

(e)     The Individual Defendants and E&Y were failing to write down Regions' impaired goodwill post-Acquisition, causing the Company's balance sheet and financial results to be artificially inflated;

(f)     The Individual Defendants and E&Y failed to cause Regions to accurately and timely identify over $1 billion in "problem" and "non-performing assets";

- 119 -

(g)     The Individual Defendants and E&Y caused Regions to fail to accurately and timely increase its loan loss provision by at least $1 billion during the Relevant period or to raise its allowance for credit losses as prudent accounting would have required;

(h)     The AmSouth integration was not proceeding successfully;

(i)     The value of the funds managed by Regions' subsidiary Morgan Keegan were overstated due to being laden with undisclosed subprime investments and potential ARS liabilities, exposing Morgan Keegan – and Regions – to hundreds of millions of dollars in potential civil liability and an SEC enforcement action;

(j)     The Individual Defendants were causing Regions to operate with woefully deficient internal controls, resulting in the Company improperly reporting its loan loss reserves and goodwill; and

(k)     The Individual Defendants were causing Regions' capital base to dwindle to the point that it was not able to withstand the significant deterioration in the real estate market and, as a result, Regions was forced to raise additional capital by seeking assistance from the U.S. Government.

170.   As a result of the Individual Defendants' and E&Y's false statements, Regions' stock traded at inflated levels during the Relevant period, it raised $345 million in the April 2008 Offering and the AmSouth Acquisition was completed. However, after the above revelations seeped into the market, the Company's shares

were hammered by massive sales, sending them down more than 85% from their relevant-period high.

171.   Due to the Individual Defendants' and E&Y's failure to timely disclose these material facts, a number of investors have sued the Company in class action lawsuits.  These class action lawsuits allege various violations of federal securities laws, including violations of Sections 11, 12(a)(2) and Section 15(a) of the 1933 Securities Act.  Because of the Individual Defendants' and E&Y's misconduct, Regions is exposed to potential criminal liability, hundreds of millions of dollars in potential criminal and civil fines and penalties, and hundreds of millions of dollars in costs to defend lawsuits and satisfy adverse judgments or settlements.  Moreover, as a direct and proximate result of the defendants' misconduct, Regions' once valuable banking enterprise and reputation has been irreparably diminished.

172.   The defendants each owed and failed to carry out their fiduciary obligations to the Company and its shareholders.  This shareholder derivative action on behalf of Regions seeks to recover damages caused to the Company by its directors, CEO and senior officers, outside auditors and financial advisors who breached their fiduciary obligations to the Company.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

## FUTILITY OF DEMAND ALLEGATIONS

173.   Plaintiff brings this action derivatively in the right and for the benefit of Regions to redress injuries suffered and to be suffered by Regions as a direct result of the breaches of fiduciary duty, corporate waste, abuse of control, as well as the aiding and abetting thereof, by the Individual Defendants, E&Y and Merrill Lynch.  Regions is named as a nominal party solely in a derivative capacity.

174.   In bringing this action, Plaintiff has satisfied all statutory procedural requirements of applicable law.  First, Plaintiff has standing to bring this action as it is a shareholder of Regions and was a shareholder of Regions at relevant times.  Second, Plaintiff will fairly and adequately represent the interests of Regions in enforcing its rights, as detailed herein.  Third, this action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than to correct the wrong that has been done to the Company.  To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

175.   As of the filing of this Complaint, the Regions Board consists of defendants Ritter, Hall, Deavenport, Styslinger, Matlock, Bryan, Bartholomew, Roberts, Cooper, DeFosset, Malone, McCrary, Nielsen and Maupin.   These defendants are referred to as the "Director Defendants."  The Director Defendants were all directors of Regions, acquiesced in and/or were complicit in obtaining shareholder approval of the Acquisition, issuing a false and misleading prospectus

- 122 -

in connection with the April 2008 Offering and causing and/or permitting Regions to make misleading statements to the investment community concerning the value of the goodwill attributable to the Acquisition and the adequacy of Regions' loan loss reserves and internal controls thereafter.  As such, the Regions Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action.  Thus, Plaintiff's demand upon the Company to take the action requested herein is excused.  For the following reasons and those detailed elsewhere in this Complaint, Regions' Board and its management are also antagonistic to this lawsuit and thus, Plaintiff has not made a pre-filing demand on the Regions Board to initiate this action:

(a)     The factual allegations contained herein detail a widespread, continuous pattern and practice of misconduct that spans more three years.  Each of the Individual Defendants had the ability to cause Regions to disclose that it had overpaid for AmSouth during that three-year period and failed to do so.  Each defendant also had the ability and duty to force Regions to comply with the TARP executive compensation, risk-reduction and clawback provisions, and failed to do so. The misconduct is so widespread and persisted over so many years and is so damaging to Regions that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or

willful or reckless disregard of the nations' securities laws and the TARP executive compensation, clawback and risk-reduction protocols;

(b)     Each member of the Director Defendants was a director when Regions signed onto the TARP program and has been responsible for implementing the TARP executive compensation restrictions and has intentionally refused to do so;

(c)     As detailed elsewhere herein, an overwhelming majority of the current members of the Regions Board are hopelessly conflicted as well as potentially personally liable and as such, have not and cannot, comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Regions, as this would require them to sue themselves, several of Regions' current executives and several former Board members and executives (who they have improperly caused Regions to release or agree to indemnify) who would provide damning inculpatory testimony as to the current Board's involvement, knowledge and malfeasance if they were sued.

(d)     The members of Regions' Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  These directors are well-compensated, as demonstrated by the directors' fees Regions paid in 2008 alone:

**DIRECTOR COMPENSATION**

- 124 -

| Name | Fees Earned or Paid in Cash ($) | Option Awards ($)(1) | Total ($) |
|---|---|---|---|
| Samuel W. Bartholomew, Jr. | $   65,000 | $15,742 | $   80,742 |
| George W. Bryan | $   66,500 | $15,742 | $   82,242 |
| David J. Cooper, Sr. | $   65,000 | $31,436 | $   96,436 |
| Earnest W. Deavenport, Jr. | $   82,500 | $31,436 | $   113,936 |
| Don DeFosset | $   71,000 | $31,436 | $   102,436 |
| Martha R. Ingram | $   15,500 | $49,454 | $   64,954 |
| James R. Malone | $   79,500 | $31,436 | $   110,936 |
| Susan W. Matlock | $   66,500 | $15,742 | $   82,242 |
| John E. Maupin, Jr. | $   65,000 | $15,206 | $   80,206 |
| Charles D. McCrary | $   79,250 | $31,436 | $   110,686 |
| Claude B. Nielsen | $   81,500 | $31,436 | $   112,936 |
| Jorge M. Perez | $   43,500 | $      0 | $   43,500 |
| John R. Roberts | $   84,750 | $15,742 | $   100,492 |
| Lee J. Styslinger III | $   77,000 | $15,742 | $   92,742 |
| Spence L. Wilson | $   67,000 | $44,349 | $   111,349 |
| Harry W. Witt | $   14,000 | $28,529 | $   42,529 |

(e)     According to the Company's 2009 Annual Proxy Statement, the

members of the Regions Compensation Committee, Nielsen (chair), Bryan,

Deavenport, Matlock and Styslinger were charged with "approving Regions'

executive compensation objectives and ensuring that the compensation programs and

policies of the Company support the business goals and strategic plans approved by

the Board."     Following Regions' receipt of TARP funds, the Compensation

Committee was also required to comply with a number of executive compensation

standards during the period of time in which the U.S. Government (*i.e.*, its taxpayers)

hold an equity position in Regions, including four initial standards, which applied to

Regions' CEO, CFO and the three next highest paid executive officers, including:

(a) limits on severance payments to senior executive officers; (b) *a requirement that*

*Regions "clawback" bonuses, retention awards and incentive compensation paid to*

*senior executive officers if they were based on materially inaccurate financial*

- 125 -

***statements or any other materially inaccurate performance metric criteria (whether or not the executive was at fault, any misconduct occurred, or the financial statements were restated)***; (c) a requirement that the Compensation Committee review senior executive officer compensation programs with its senior risk officers and certify that the Company has made reasonable efforts to ensure that the incentive compensation arrangements do not encourage unnecessary and excessive risks that threaten its value; and (d) a prohibition against Regions' taking a tax deduction for annual compensation over $500,000.  Thereafter, additional compensation standards were enacted pursuant to the American Recovery and  Reinvestment Act of 2009 ("ARRA") passed February 17, 2009 which Regions, as a TARP recipient, was required to comply with.  These standards extended beyond the Company's senior executive officers and applied to up to the next 20 most highly-compensated employees and included:  (a) a prohibition against severance payments to Regions' senior executive officers and the next five most highly-compensated employees, other than payments for services performed or benefits accrued; (b) a prohibition on bonuses, retention awards, and other incentive compensation to any senior executive officer or any of the next 20 most highly-compensated employees subject to certain limited exemptions; (c) a stricter clawback provision extending to the next 20 most highly compensated employees in addition to the senior executive officers; and (d) a prohibition on adopting or implementing any compensation plan that would encourage

manipulation of the reported earnings of the Company in order to enhance the compensation of any of its employees.  Turning these principles on their heads, in addition to failing to increase Regions' risk controls, to recalibrate its compensation policies or to effect a clawback of incentive compensation and bonuses, as required under the TARP and related directives, in February 2009 Regions' Compensation Committee:  (i) left Ritter's annual salary at $995,000, Esteves' annual salary at $575,000, and Hall's annual salary at $675,000, all well above the $500,000 ceiling established, resulting in a substantial increase in Region's federal tax liability; (ii) paid certain senior executives a "merger cost savings performance" ***bonus***, including granting Ritter more than $1 million worth of restricted stock (on top of the approximately $4 million worth of stock options and restricted stock units he received during fiscal 2008), paying Esteves a $1 million cash bonus, paying Hall a $495,910 bonus (on top of the $1.2 million worth of stock options he received during fiscal 2008), and paying senior executives Edmonds and Wells $241,110 and $253,800, respectively, in bonuses; (iii) granted Ritter an additional 22,789 shares of "service-based restricted stock . . . . in recognition of his performance in leading the Company through the successful merger with AmSouth"; (iv) in connection with the January 2009 promotion of William Ritter, the son of Dowd Ritter, to senior executive vice president and president of the central region, covering Alabama, Georgia and South Carolina, William Ritter obtained a salary increase to $350,000, $350,000 worth of

stock options or restricted stock, received a bonus of 43% of his salary in 2008 and purportedly is in line to receive a bonus of 90% of his new salary in 2009; and (v) granted a variety of perks including the provision of a corporate jet for Ritter (for both personal and professional travel), and offing all executives financial planning services, company-paid excess liability policies, company-provided security coverage for private residences and enhanced coverage for annual routine physicals. By these decisions, Regions' shareholders are being penalized twice: as the firm's equity owners, they pay the ultimate price for defendants' misconduct, and then they must pay bonuses on top of handsome salaries – despite the TARP guideline prohibitions against it. By virtue of the fact that each member of the Compensation Committee was charged with ensuring that Regions' compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, these defendants are personally implicated by the allegations contained herein.

   (f) Moreover, despite the TARP requirements that the Regions Board "clawback" incentive compensation and bonuses, the Board has failed to do so. Each of these decisions would be called into question, and evidence of their conduct revealed, if the current directors investigated the allegations herein.

   (g) As members of the Regions Audit Committee during the relevant period, defendants Roberts (chairman), DeFosset, Malone, McCrary and Styslinger

were charged with selecting and assessing the performance of Regions' outside auditors and approving their fees and independence; assessing and approving the annual audit results of the Company; establishing and enforcing Regions' financial and accounting policies and its annual and quarterly financial statements; reviewing the adequacy and effectiveness of Regions' internal accounting controls and the internal audit function; overseeing the Company's programs for compliance with laws, regulations and Company policies and, in connection with all of the foregoing, meeting with the independent auditors, internal auditors and Regions' financial management. As such, these Audit Committee defendants had direct oversight and participation in the decision to falsely inflate Regions' goodwill attributable to the AmSouth Acquisition. These Audit Committee defendants also repeatedly facilitated the Company's non-compliance with the nation's accounting rules, regulations and Company policies by refusing to exercise their authority under the Audit Committee charter to remove the offending officers and directors from their posts.

(h)     A majority of the Director Defendants approved the AmSouth Acquisition which damaged the Company and signed the false and misleading proxy statement used to obtain the approval of Regions' shareholders, subjecting each to personal liability for violations of the federal securities laws;

(i)     Regions' Risk Committee, which held only five meetings during 2008, even as the Company was taking on more and more risk in a downward market,

consists of Malone, Bartholomew, and Maupin.  Despite this Committee's charge to "assist the Board in overseeing, and receiving information regarding, Regions' policies, procedures and practices relating to asset and liability management, and credit, market and operational risk," even after Regions obtained the TARP funds and became subject to its risk-reduction restrictions, Regions' management actively and aggressively increased the Company's risk positioning in the real estate market in furtherance of larger profits and increased market share.  To this end, Regions undertook a highly speculative course of conduct by concentrating its capital in the real estate sector, and thereby extending bank credit towards speculative investment projects in commercial real estate throughout the Southeast, including Tennessee, Florida, and Georgia.  Such lending activities exceeded all reasonable lending standards and risk management controls, as they were based upon clearly erroneous assumptions of continued economic growth and prosperity and over-inflated real estate values for the collateral on such loans.  That Regions continued to extend credit in speculative commercial real estate ventures based upon inflated collateral values even as the proportion of nonperforming real estate loans increased from 2005 onwards.  During the relevant period, and despite clear warning signs to the contrary, Regions remained overly optimistic regarding collateral values and market expectations and thereby increased its exposure to these asset markets.  As a result, the

Company had grossly over-extended its lending into these speculative markets and has sustained, and continues to face, substantial losses.

(j)    Vigorously investigating the wrongdoing alleged herein, or suing to remedy it, would require the Regions Board to denounce entrenched positions. Defendants could also have to reveal evidence of their culpability. Prosecution of the allegations contained herein in light of the Regions Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil liability.

(k)    The members of Regions' Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.   These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to, and will not, vigorously prosecute any such action, including the facts that:

(i)    All of the Directors, either individually or through an affiliated entity, have a customer relationship with Regions, such as a deposit, brokerage, trust or other financial services relationships.

- 131 -

(ii)     Bryan, Cooper, Deavenport, Malone, Matlock, Maupin, McCrary, Nielsen, Roberts and Styslinger, either individually or through an affiliated entity, have bank loans from Regions.

(iii)    Bryan, Cooper, Malone, Matlock, Maupin, McCrary, Nielsen, Roberts and Styslinger serve in leadership positions with a charitable organizations to which Regions made significant charitable contributions to in 2006, 2007 or 2008.

(iv)     Cooper's nephew is serving on Regions' local advisory board in Mobile, Alabama, one son-in-law was a non-executive employee of Morgan Keegan & Company, Inc., and another son-in-law was a non-executive employee of Regions Bank in the private banking area during a portion of 2008.

(v)      Nielsen's son is a non-executive employee of Regions Bank in the capacity of branch manager.

(vi)     As executive directors, Ritter and Hall are beholden to the other Regions' directors for their livelihood and could not independently investigate or prosecute these claims.

(vii)    As McCrary serves as president and CEO of Alabama Power Company, a public utility where defendants Ritter and Cooper serve as directors, McCrary will not sue Ritter or Cooper as it would jeopardize his livelihood to do so.

- 132 -

(viii) Because McCary and Ritter also serve on the Protective Life Corporation board of directors together and Hall and Deavenport also serve on the Zep, Inc. board of directors together, these defendants will not exercise their fiduciary duties to diligently investigate and prosecute one another.

(ix)    As defendant Styslinger serves as CEO of Altec, Inc., a equipment and service provider for the electric utility, telecommunications and contractor markets, and according to Styslinger Alabama Power Company, is one of Altec's most important customers, Styslinger will not bring the claims alleged herein against defendants McCrary, Ritter or Cooper, as Styslinger's livelihood and career prospects would be compromised if he actively investigated or made the decision to prosecute these claims.

(x)    William Ritter, a Regions Regional President and Dowd Ritter's son, also serves as a board member for Innovation Depot, Inc., an emerging business incubation center that Matlock founded and where she currently serves as president and CEO.  Innovation Depot was founded by Matlock at the University of Alabama's Entrepreneurial Center where Matlock was the founding President.  Regions and its senior executive ranks (including former CEO Carl E. Jones, Jr.) have long been significant financial supporters of the University of Alabama and the University provides preference to children of Regions' employees in its scholarships.  By virtue of the personal, professional

- 133 -

and financial ties of Matlock and the Innovation Depot to Regions and its senior executives, Matlock cannot prosecute the claims alleged herein against the other Regions' board members as it would jeopardize her livelihood to do so.

(xi)   Having served as CEO of Old Waverly Investments, LLC, a real estate firm, since 2001, Bryan could not prosecute the claims alleged herein against the other Regions' board members as Old Waverly Investments does business with and in the same investment communities as Regions and it would jeopardize Bryan's professional and financial prospects to prosecute these claims, something he will not do.

(xii)   Bartholomew serves as chairman emeritus of Nashville law firm Adams & Reese LLP, which merged with Bartholomew's prior firm, Stokes Bartholomew, on June 30, 2005, and Regions has provided both firms with substantial legal work, including paying the firm over $2.6 million during 2008 alone. Bartholomew has also served as a Clinical Professor of Business Law at Vanderbilt-Owen School of Management, a school which advertises that Regions Morgan Keegan Trust routinely recruits its MBAs. As such, by virtue of his personal, professional and financial relationships with Ritter, Hall, Regions' other executives who determine which law firms will get Regions' work, and the other members of the Regions' board, Bartholomew cannot

- 134 -

independently investigate or bring the allegations contained herein as it would jeopardize his livelihood and financial interests (including firm profit-sharing relationships) to do so.

(xiii) Roberts, the retired managing partner from 1993 to 1998, Mid-South Region, of Arthur Andersen LLP, then a certified public accounting firm, could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein, as Roberts' accounting background renders him an expert and subjects him to increased personal liability and professional humiliation. Moreover, because Roberts spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits and sympathy toward firms like E&Y – he will never sue them, and could not, in any event, since he is only one Board member.

(xiv) DeFosset, who served as chairman, president and CEO of Walter Industries, Inc., a diversified company with businesses in home building and mortgage financing, until 2005 could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein, as DeFosset's real estate finance background renders him an expert and subjects him to increased personal liability and professional humiliation. Moreover, by virtue of his personal, professional and financial relationships developed over the

- 135 -

years with the other Director Defendants, DeFosset could not independent and disinterestedly investigate or prosecute the claims alleged herein.

(xv)    Malone is the founding and managing partner of Qorval LLC, a financial and business restructuring, consulting and investment banking firm, and the founder and partner in Boyne Capital Partners, LLC, a private equity investment firm.  As an investment banker, Malone's livelihood is dependent upon his maintaining personal, financial and professional relationships with Regions' executives and others in the greater banking community that Regions is a member of and prosecuting the claims alleged herein would threaten those relationships, something Malone will not do.

(xvi)  Malone was also recently appointed Chair of the Board of Governors of Citizens Property Insurance Corporation, created by the Florida Legislature in 2002 as the state's property insurer of last resort.  Though CPIC offers property coverage to Floridians without private insurance options, it writes 30% of Florida's property insurance policies and creates billions of dollars in earnings a year.  As much of this business derives from Regions-financed properties, it would jeopardize Malone's livelihood to investigate and/or prosecute the claims herein.

(l)    Members of the Regions Board as a whole had direct knowledge of the illegal malfeasance, had the requisite financial background to understand the

- 136 -

illegality of the conduct and had close alliances with and allegiances to the inside directors and other culpable parties who engaged in the illegal activities complained of herein who they are dependent upon for continuation of their lucrative and prestigious positions as directors.

(m)  In order to bring this action for breaching their fiduciary duties, the members of the Regions Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

(n)  Regions' current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Regions.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Regions against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Regions, there would be no directors' and

- 137 -

officers' insurance protection and thus, this is a further reason why the directors will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

176. For the foregoing reasons, there is a reasonable doubt that: (i) the directors are disinterested and independent; or (ii) their conduct, which is at issue here, was otherwise the product of valid business judgment.

## AIDING AND ABETTING AND CONCERTED ACTION

177. In committing the wrongful acts alleged herein, each defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan. The purpose and effect of the defendants' common course of conduct was, among other things, to disguise the defendants' violations of law and breaches of fiduciary duty, and to enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

178. The Individual Defendants accomplished their common enterprise or common course of conduct by causing the Company to purposefully or recklessly violate the TARP executive compensation restrictions, risk-reduction requirements and clawback provision, and state and federal law, including the federal securities laws, and abdicate their duties as directors. Each defendant, including E&Y and

Merrill Lynch, was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

179.   Each defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

180.   At all times relevant hereto, each defendant was an agent of each of the other defendants and was at all times acting within the course and scope of such agency.

## COUNT ONE

### Breach of Fiduciary Duty

181.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

182.   The Individual Defendants each owed Regions and its shareholders the highest fiduciary duties of loyalty, good faith and due care in managing and administering the Company's affairs.

183.   The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls and financial affairs of Regions.  By virtue of their duties of loyalty, good faith and due care:

- 139 -

(a)    The Individual Defendants were required to exercise reasonable control and supervision over the Company's officers, employees, agents, business, and operations;

(b)    The Individual Defendants were required to make inquiries, use sound business judgment, and remain informed about Regions' financial performance and operations, and upon receiving notice or information of an imprudent, unsound or unlawful decision, condition, or practice, the Individual Defendants were required to undertake a reasonable investigation in connection therewith, were required to undertake steps to correct the decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner;

(c)    The Individual Defendants were required to accurately calculate and report to Regions' shareholders the value of AmSouth's real estate loan portfolio in connection with obtaining shareholder approval of the Acquisition and the fairness of the purchase price Regions was paying for those assets; and

(d)    Once Regions signed onto the TARP program, the Individual Defendants were required to comply with the TARP executive compensation restrictions, the risk-reduction requirements and the clawback provisions.

184.   Defendants breached their fiduciary duties owed to Regions and its shareholders, or aided and abetted in the breach of other defendants' fiduciary duties, by willfully, recklessly and intentionally failing to perform their fiduciary

duties. They caused the Company to waste valuable assets, unnecessarily expend corporate funds, and failed to properly oversee Regions' business, rendering them personally liable to the Company.

185. As a direct and proximate result of defendants' breaches of their fiduciary duties of loyalty, good faith and due care, and aiding and abetting those breaches, as alleged herein, Regions has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT TWO

### Gross Mismanagement

186. Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

187. As detailed more fully herein, the Individual Defendants each owed a duty to Regions and its shareholders to prudently supervise, manage and control Regions' operations.

188. Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage Regions' business and assets.

189. As such, defendants subjected Regions to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound

business judgment, including their failure to understand and monitor the Company's fiscal and financial performance. The Individual Defendants breached their duties of due care and diligence in managing and administering Regions' affairs and by failing to prevent a waste of Company assets, and E&Y and Merrill Lynch aided and abetted those breaches.

190. When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or failed to supervise such activities in accordance with their duties. The Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Regions and its assets.

191. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, aided and abetted by E&Y and Merrill Lynch, Regions has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, all defendants are liable to the Company.

## COUNT THREE

### Waste of Corporate Assets

192. Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

- 142 -

193.   Because of defendants' misconduct, Regions will incur costs and fees in the millions of dollars defending lawsuits and satisfying adverse judgments or settlements.

194.   As a result of the conduct alleged herein, the Individual Defendants have caused Regions to waste valuable corporate assets, aided and abetted by E&Y and Merrill Lynch.

195.   As a direct and proximate result of the defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Regions has sustained and continues to waste precious corporate assets and thus sustain damage.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT FOUR

### Breach of Duty by Ernst & Young, LLP, and Aiding and Abetting by Merrill Lynch

196.   Plaintiff realleges and incorporates each of the forgoing paragraphs by reference as though fully set forth herein.

197.   As Regions' public accountants and auditors, E&Y owes a duty of care to the corporation to perform its duties in a diligent manner and in accordance with professional standards.

198.   Defendant E&Y breached its professional duty to Regions by performing its auditing and public accounting functions in a negligent, grossly negligent, and reckless manner.

- 143 -

199.  Defendant E&Y negligently, recklessly, and/or wantonly failed to institute adequate procedures and controls to discover the wrongdoings and misleading accounting, and similarly through such negligent, wanton, and reckless conduct, failed to discover (a) the false accounting set forth herein, and (b) the many related party transactions pled above.

200.  Defendant E&Y negligently, recklessly, and/or wantonly failed to cause management to produce financial statements that were correct in all material respects, but should have done so before signing off on its annual audits and before reviewing the corporations quarterly financial statements.

201.  Regions has suffered damages as a result of E&Y's negligence, gross negligence, wantonness, and recklessness.  These damages include, but are not limited to, the following:  payment of taxes on falsely reported income; legal fees and costs in defending securities class actions cases and any judgments or settlement that Regions may pay in such cases; damages resulting from failure to recognize Regions' true financial state and act accordingly; opportunity costs; incentive compensation that Regions may have paid based on falsely reported revenues and earnings; and the like.

202.  Wherefore, Plaintiff, for and on behalf of Regions, seeks money damages from E&Y, in an amount to be determined by the trier of fact to compensate the corporation for its damages, plus interest, attorneys' fees, costs,

return of auditors' fees, and all such other relief at law and equity to which the corporation may be entitled.

## COUNT FIVE

### Breach of Duty, Suppression, and Aiding and Abetting by Merrill Lynch

203. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

204. Merrill Lynch held a position of trust with Regions and was in every legal and practical sense a fiduciary of Regions.

205. Merrill Lynch indeed demonstrated the heightened nature of its inside information about Regions, and manifested an understanding of the financial troubles at Regions.

206. Merrill Lynch aided and abetted breaches of fiduciary duty by the Individual Defendants.

207. Furthermore, Merrill Lynch improperly deferred to Ritter's and Moore's opinions as to the fairness to Regions' shareholders of the Acquisition and suppressed the information it had regarding the true value of AmSouth's assets, thereby breaching its fiduciary duty to Regions and its shareholders.

208. Merrill Lynch's fiduciary breaches, and its aiding and abetting of the breach of fiduciary by the Individual Defendants, proximately caused injury to Regions, including the following: payment of taxes on falsely reported income;

- 145 -

legal fees and costs in defending securities class actions and any judgments or settlement that Regions may pay in such cases; damages resulting from failure to recognize Regions' true financial state and act accordingly; opportunity costs; incentive compensation that Regions may have paid based on falsely reported revenues and earnings; payment of unwarranted investment banking fees; and the like.

209.   Plaintiff seeks damages for Regions based on the above, and also seeks an accounting and other disgorgement of moneys obtained by Merrill Lynch in investment banking fees paid by Regions and its affiliates from 2006 to the present.

210.   Wherefore, Plaintiff, for and on behalf of Regions, seeks money damages from Merrill Lynch, in an amount to be determined by the trier of fact to compensate the corporation for its damages, plus interest, attorneys' fees, costs, and all such other relief at law and equity to which the corporation may be entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in the Company's favor against the Individual Defendants, E&Y and Merrill Lynch as follows:

A.      Determining this action is a proper derivative action, Plaintiff is an adequate representative on the Company's behalf, and demand is excused;

B.      Determining the Individual Defendants, E&Y and Merrill Lynch have breached or aided and abetted the breach of their fiduciary duties to Regions;

C.      Awarding Regions the damages it sustained due to the violations alleged herein from each of the Individual Defendants, E&Y and Merrill Lynch jointly and severally, together with interest thereon;

D.      Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, incentive compensation, restricted stock awards, options, and common stock sales proceeds and imposing a constructive trust thereon;

E.      Directing Regions to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, the TARP executive compensation restrictions, risk-reduction requirements and clawback provision duties, including but not limited to, putting forward a shareholder vote resolution for amendments to the Company's Articles of Incorporation and taking such other actions as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)      an amendment enhancing the Regions Board's director independence standards to exceed those of the New York Stock Exchange listing requirements;

- 147 -

(ii)     a proposal to strengthen the Regions Board's supervision of banking operations and development and implementation of procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)     a provision to permit the shareholders of Regions to nominate at least three candidates for election to the Regions Board;

(iv)     appropriately test and then strengthen the internal audit and control functions;

(v)     reform executive compensation to first, comply with the TARP mandates affecting executive compensation and requiring clawbacks, and second, even after the TARP funds have been repaid, retain the TARP requirement that at each annual meeting of stockholders, permits shareholders to cast a separate non-binding "say on pay" shareholder vote to approve the compensation of executives;

(vi)     refine Regions' executive compensation principals to tie pay to performance and to reduce the incentive to take on inordinate risk;

(vii)     an amendment requiring full compliance with Sarbanes-Oxley;

(viii)     permit shareholders to question all executive directors of Regions and the Annual Meeting of Shareholders and establish a more transparent process for receiving and evaluating shareholder proposals; and

- 148 -

(ix)      an amendment requiring that a report, updated semi-annually, be published and filed with the SEC disclosing the Company's: (a) policies and procedures for political contributions and expenditures (both direct and indirect) made with corporate funds and (b) monetary and non-monetary political contributions and expenditures not deductible under sections 162 (e)(1)(B) of the Internal Revenue Code, including but not limited to, contributions to or expenditures on behalf of political candidates, political parties, political committees and other political entities organized and operating under 26 U.S.C. §527 of the Internal Revenue Code and any portion of any dues or similar payments made to any tax exempt organization that is used for an expenditure or contribution if made directly by the corporation would not be deductible under §162 (e)(1)(B) of the Internal Revenue Code.  The report shall include the following:  (i) an accounting of the Company's funds that are used for political contributions or expenditures as described above; (ii) identification of the person or persons in the Company who participated in making the decisions to make the political contribution or expenditure; and (iii) the internal guidelines or policies, if any, governing the Company's political contributions and expenditures.  The report shall also be presented to the Board of Director's Audit Committee or other relevant oversight committee and posted on the Company's website to reduce cost to shareholders.

F.      Awarding Regions exemplary damages in an amount necessary to punish the Individual Defendants, E&Y and Merrill Lynch and to make an example of the Individual Defendants, E&Y and Merrill Lynch to the community according to proof at trial;

G.      Awarding Regions restitution from each Individual Defendant;

H.      Awarding Regions equitable or injunctive relief as permitted by law;

I.      Awarding Plaintiff the costs and disbursements of this derivative action, including reasonable attorneys' fees, costs and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

DATED: May 22, 2009

GREG L. DAVIS (DAV077)
*One of the Attorneys for Plaintiff*

GREG L. DAVIS, L.L.C.
6987 Halcyon Park Drive
Montgomery, Alabama 36117
Telephone: 334-832-9080
Facsimile: 334-409-7001
Email:  gldavis@knology.net

SCOTT + SCOTT LLP
ARTHUR SHINGLER III
MARY K. BLASY
600 B Street, Suite 1500
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
Email:  mblasy@scott-scott.com

SCOTT + SCOTT LLP
JOSEPH GUGLIELMO
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone:  212-223-6444
Facsimile:  212-223-6334
Email:  jguglielmo@scott-scott.com

Attorneys for Plaintiff

- 151 -

## VERIFICATION

I, R. Randall Roche, General Counsel for Louisiana Municipal Police Employees Retirement System declare that I have reviewed the Verified Derivative Complaint ("Complaint") prepared on behalf of Regions Financial Corp., and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that Louisiana Municipal Police Employees Retirement System is a current holder, and has been a holder, of Regions Financial Corp. common stock at relevant times.

May 21 2009
_____
Date